# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
**NICK KORETOFF, d/b/a**                        )
**NICK KORETOFF RANCHES,** *et al.*,            )
                                                )
**Plaintiffs,**                                 )
                                                )
v.                                              )   **Civil Action No. 08-1558 (ESH)**
                                                )
**THOMAS VILSACK, Secretary,**                  )
**United States Department of Agriculture,**    )
                                                )
**Defendant.**                                  )
_____ )

## <u>MEMORANDUM OPINION</u>

In 2007, in response to *Salmonella* outbreaks in 2001 and 2004 that were linked to raw almonds, the United States Department of Agriculture (USDA) promulgated a rule requiring that almonds produced domestically be pasteurized or chemically treated against the bacteria. Almonds Grown in California; Outgoing Quality Control Requirements, 72 Fed. Reg. 15,021, 15,034 (Mar. 30, 2007) (codified at 7 C.F.R. § 91.442(b)) (the "*Salmonella* Rule"). Plaintiffs, California almond producers, brought suit against the Secretary of Agriculture in 2008 to challenge the *Salmonella* Rule. (Complaint, Aug. 9, 2008 [Dkt. No. 1]; First Amended Complaint, Dec. 5, 2008 [Dkt. No. 9].)

Pending before the Court are plaintiffs' and defendant's cross-motions for summary judgment. (*See* Plaintiffs' Motion for Summary Judgment, Aug. 8, 2011 [Dkt. No. 46] ("Pls.' Mot."); Defendant's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, Sept. 15, 2011 [Dkt. No. 47] ("Def.'s Mot."); Plaintiffs' Opposition to

Defendant's Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for

Summary Judgment, Oct. 31, 2011 [Dkt. No. 51] ("Pls.' Response"); Defendant's Reply in

Support of Defendant's Motion for Summary Judgment, Nov. 18, 2011 [Dkt. No. 54] ("Def.'s

Reply").)  For the reasons stated below, the Court will deny plaintiffs' motion for summary

judgment and grant defendant's motion for summary judgment.[1]

## BACKGROUND

In a prior decision in this matter, the D.C. Circuit described the relevant background:

This case involves the Agricultural Marketing Agreement Act of 1937, a
landmark piece of legislation that arose out of the farming catastrophe during the
Great Depression.  The AMAA authorizes the Secretary of Agriculture to
promulgate marketing orders that regulate the production and sale of agricultural
commodities.  7 U.S.C. §§ 601–674.  It seeks to "avoid unreasonable fluctuations
in supplies and prices" of various farm commodities.  *Id.* § 602(4).  The AMAA is
currently applied to about three dozen agricultural commodities, such as milk,
avocados, oranges, and peanuts.  *Agricultural marketing orders may dictate the
"total quantity" of a regulated commodity sold in a particular region, as well as
the "grade, size, or quality thereof." Id.* § 608c(6)(A). . . .

In 1950, acting pursuant to the AMAA, the Secretary of Agriculture
promulgated the California Almond Marketing Order, 7 C.F.R. pt. 981.  The
Almond Order has been amended often in the 60 years since.  Among other
things, the Order sets quality standards for commercially sold almonds and
regulates the quantity of almonds that may be sold in a given year.

In the wake of two [*S*]*almonella* outbreaks in 2001 and 2004, the
Secretary in 2007 issued [the *Salmonella* Rule] under the Almond Order. . . .

---

[1] The government has also moved to strike the appendix of documents that plaintiffs submitted
with their motion for summary judgment.  (Defendant's Motion to Strike Plaintiffs' Appendix of
Exhibits, Sept. 15, 2011 [Dkt. No. 48]; Plaintiffs' Opposition to Defendant's Motion to Strike,
Nov. 1, 2011 [Dkt. No. 52]; Defendant's Reply in Support of Defendant's Motion to Strike, Nov.
18, 2011 [Dkt. No. 55].)  Because the Court concludes that plaintiffs' claims fail regardless of
whether the extra-record evidence is considered (in large part because that evidence either
undermines plaintiffs' arguments or is neutral to them), the Court denies the government's
motion as moot.  *See Zuber v. Allen*, 396 U.S. 168, 171 n.1 (1969) (Although "[t]he parties have
devoted a good deal of energy to disputing what constitutes the record in this litigation[,] . . .
[t]he Court need not pause over the controversy since none of the materials in [plaintiffs']
appendix is decisive of the action before [it].").

> The [*Salmonella* Rule] required the use of one of several approved methods for reducing [S]*almonella* bacteria in almonds, all involving either pasteurization or chemical treatment of nearly all almonds sold.  7 C.F.R. § 981.442(b). . . .
>
> The current dispute arises primarily because the [*Salmonella* Rule] had the effect of largely eliminating the domestic *raw* almond market.  [Plaintiffs] are California almond producers who grew raw almonds for domestic U.S. consumption.  Because the [*Salmonella* Rule] devastated the market for domestic raw almonds, those producers allege that they lost both their expected profits from the premium price paid for raw almonds and the return on investments they had made in production equipment.

*Koretoff v. Vilsack*, 614 F.3d 532, 534–35 (D.C. Cir. 2010) ("*Koretoff II*") (emphasis added; citation omitted).

Plaintiffs' First Amended Complaint alleges that the Secretary exceeded his authority under the AMAA and the Almond Order when promulgating the *Salmonella* Rule (first and third causes of action); that the *Salmonella* Rule is void because it was promulgated by notice and comment rulemaking without a hearing and without being subject to a vote by almond producers (second cause of action); and that the *Salmonella* Rule is void because the Almond Order, under which the Rule was issued, was itself not lawfully promulgated (fifth cause of action).[2]

---

[2] Plaintiffs' First Amended Complaint also alleged that the *Salmonella* Rule is not supported by the record and is arbitrary and capricious (fourth cause of action), and that the *Salmonella* Rule improperly regulates the retail market for almonds in violation of the AMAA (sixth cause of action).  Plaintiffs have withdrawn their claim that the *Salmonella* Rule is arbitrary and capricious.  (*See* Plaintiffs' Opposition to Defendant's Motion to Strike, November 1, 2011 [Dkt. No. 52] at 2 ("Plaintiffs do not challenge the factual findings of the agency . . . . *Plaintiffs only challenge the authority of USDA to promulgate the rule.*" (emphasis added)); *see also* Pls.' Mot. at 3–4 (setting forth the issues presented in this litigation and not arguing that the *Salmonella* Rule is arbitrary and capricious).)  Accordingly, defendant's motion for summary judgment is granted as to plaintiffs' fourth cause of action.  Plaintiffs' sixth cause of action was previously dismissed by this Court on March 9, 2009, for failure to exhaust administrative remedies.  *See Koretoff v. Vilsack*, 601 F. Supp. 2d 238, 243 (D.D.C. 2009) ("*Koretoff I*"), *aff'd in part and rev'd in part*, 614 F.3d 532, 541 (D.C. Cir. 2010) (affirming the dismissal of plaintiffs' sixth cause of action but reversing the dismissal of plaintiffs' other causes of action, holding that the

**STANDARD OF REVIEW**

The Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA"), "establishes a cause of action for those 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action.'" *Id.* at 536 (quoting 5 U.S.C. § 702). As relevant here, the APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are in excess of statutory authority, 5 U.S.C. § 706(2)(C), or "without observance of procedures required by law." *Id.* § 706(2)(D).

Under the APA, summary judgment "serves as the mechanism for deciding, as a matter of law, whether agency action is . . . consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)). Accordingly, "when a party seeks review of agency action under the APA," the usual summary judgment standard does not apply and "the district judge" instead "sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).[3]

---

AMAA does not preclude almond producers from obtaining judicial review of the *Salmonella* Rule).

[3] In filing their motion for summary judgment, plaintiffs appended a separately paginated "Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment." (*See* Pls.' Mot. at 33–57 (page numbers referring to those of the overall motion, which was filed as a single PDF on the Court's ECF docket).) Defendant is correct in arguing that plaintiffs' submission was improper. (*See* Def.'s Mot. at 5 n.5 ("Rather than following the requirements of Local Rule 7(h)(2), which applies to" agency review cases, plaintiffs "included a separate statement of material facts pursuant to Local Rule 7(h)(1), thereby treating this case as a civil action that has proceeded to summary judgment after discovery.")

**ANALYSIS**

## I.     WAIVER

A central tenet of administrative law requires those who challenge agency action to raise

their claims before the agency prior to bringing them in court.  *Nat'l Wildlife Fed'n v. EPA*, 286

F.3d 554, 562 (D.C. Cir. 2002) ("[T]here is a near absolute bar against raising new issues—

factual or legal—on appeal in the administrative context.").  Where, as here, the challenged

agency action followed notice and comment rulemaking, "issues not raised in comments before

the agency are waived and this Court will not consider them."  *Id.*  There is no exception for

lawsuits alleging that an agency has exceeded its statutory authority or committed a procedural

error.  *See Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 7 (D.C. Cir. 2011) ("'failure to raise a

particular question of statutory construction before an agency constitutes waiver of the argument

in court'" (collecting cases) (quoting *Natural Resources Defense Council v. EPA*, 25 F.3d 1063,

1074 (D.C. Cir. 1994)); *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 707 (D.C. Cir.

2009) (reciting "'the well-settled premise that objections to agency proceedings must be

presented to the agency in order to raise issues reviewable by the courts'" (some internal

quotation marks omitted) (quoting *Salt Lake Cmty. Action Program v. Shalala*, 11 F.3d 1084,

1087 (D.C. Cir. 1993))).  The waiver doctrine reflects the deference courts owe to agency

interpretations, respects agency autonomy, and promotes judicial efficiency.  *Ohio v. EPA*, 997

F.2d 1520, 1528–29 (D.C. Cir. 1993) (per curiam).

The government argues that plaintiffs have waived all of their claims by not presenting

them to the USDA during the public notice and comment period that preceded the promulgation

of the *Salmonella* Rule.  (*See* Def.'s Mot. at 17–19 & n.12; Def.'s Reply at 1–5.)  Plaintiffs have

failed to respond to the government's waiver argument with regard to their fifth cause of action, alleging that *Salmonella* Rule is void because the Almond Order was not lawfully promulgated. Plaintiffs have therefore conceded the government's argument that they have waived these claims.  *See Three Lower Cntys. Cmty. Health Servs. Inc. v. U.S. Dep't of Health & Human Servs.*, 517 F. Supp. 2d 431, 434 n.2 (D.D.C. 2007).  Moreover, even if the Court were to address the merits of the government's waiver argument, it would grant defendant summary judgment on plaintiffs' fifth cause of action because there is no evidence in the administrative record that this claim was pressed before the USDA.

Whether plaintiffs are barred from seeking judicial review of their remaining claims presents a closer question.  Courts "'excuse[] the exhaustion requirements for a particular issue when the agency has in fact considered the issue,'" *Ohio v. EPA*, 997 F.2d at 1529 (quoting *Natural Resources Defense Council v. EPA*, 824 F.2d 1146, 1151 (D.C. Cir. 1987)), and plaintiffs have put forward at least some evidence to suggest that the agency considered whether the *Salmonella* Rule was within its statutory authority and whether it could be promulgated by notice and comment rulemaking.  Regarding the former, one commenter "question[ed] the authority to impose [a treatment requirement] through this rulemaking" (AR at 55), and in issuing the *Salmonella* Rule, USDA responded by stating that it was "implementing this rulemaking action under the quality control authority contained in the [Almond Order]."  72 Fed. Reg. at 15,031.  Regarding the latter, a July 2005 "Action Plan Update" issued by the Almond Board of California[4] contrasted the "**_informal rule making_**" required for promulgation of a

---

[4] The Almond Board of California (the "Board"), consisting of ten members of the almond industry selected by the Secretary, is charged with administering the Almond Order.  *See* 7 C.F.R. §§ 981.22, 981.30–33, 981.38.  (*See also supra* Section II.)  Nearly all of the almonds

treatment rule with the "**formal rule making**" which would be required in order to modify the Almond Order.  (AR at 895 (emphasis in the original).)

The government counters that neither citation suffices to show that the USDA "actually considered" plaintiffs' claims.  As to the issue of statutory authority, defendant suggests that the above-quoted statement "is so tangential to the principal thrust of the comment that it cannot fairly be said to have been presented to [the agency] for resolution," *Ohio v. EPA*, 997 F.2d at 1550, and as to the propriety of notice and comment rulemaking, defendant argues that the Board's statement preceded the initiation of the rulemaking process and did not specifically address plaintiffs' claim.  (*See* Def.'s Mot. at 18–19; Def.'s Reply at 4–5.)  The Court need not, however, resolve this issue of waiver because it concludes that the claims fail on the merits.

## II.  USDA'S AUTHORITY TO PROMULGATE THE *SALMONELLA* RULE UNDER THE AMAA AND THE ALMOND ORDER

One of "[t]he declared purposes of the [AMAA]" is "'to establish and maintain such minimum standards of quality and maturity . . . as will effectuate such orderly marketing of such agricultural commodities as will be in the public interest.'"  *Fl. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 138 (1963) (alteration in the original) (quoting 7 U.S.C. § 602(3)).  Where the Secretary "finds that it would promote" this and other "declared policies, the Secretary is empowered upon notice and hearing to adopt federal marketing orders and regulations for a particular growing area," *id.* (citing 7 U.S.C. § 608c), and for particular commodities and products.  *See* 7 U.S.C. § 608c(2).  Almonds were added to § 608c(2) in 1949 (*see* AR at 113), and the Almond Order was promulgated in 1950.  (*See* Def.'s Am. Ans. ¶ 40.)

produced domestically are grown in California.  (Defendant's Amended Answer, July 6, 2011 [Dkt. No. 44] ("Def.'s Am. Ans.") at ¶ 41.)

The AMAA specifies the types of terms and conditions that the Secretary can include in a marketing order.  *See* 7 U.S.C. § 608c(6) (providing that marketing orders for non-milk commodities, such as almonds, "shall contain one or more of the following terms and conditions, and . . . no others"); *see also id.* § 608c(5) (providing the same as regards marketing orders for milk and its products).  One of the enumerated categories allows for terms and conditions that

> [l]imit[], or provid[e] methods for the limitation of, the total quantity of any such commodity or product, or of any grade, size, or quality thereof, produced during any specified period or periods, which may be marketed in or transported to any or all markets in the current of interstate or foreign commerce or so as directly to burden, obstruct, or affect interstate or foreign commerce in such commodity or product thereof, during any specified period or periods by all handlers thereof.

*Id.* § 608c(6)(A).[5]

The Almond Order includes provisions defining key terms, 7 C.F.R. §§ 981.1–981.23; relating to the operation of the Board, *id.* §§ 981.30–981.40; providing for research, development, and marketing promotion projects, *id.* § 981.41; providing for volume regulation, *id.* §§ 981.45–981.67; and providing for the payment of assessments by almond handlers[6] to

---

[5] Marketing orders must also contain one or more of the terms and conditions specified in 7 U.S.C. § 608c(7), which include the selection and shaping of an agency to administer the marketing order, *id.* § 608c(7)(C), and any terms and conditions "[i]ncidental to, and not inconsistent with, the terms and conditions specified" in the statute "and necessary to effectuate the other provisions of [the] order."  *Id.* § 608c(7)(D).  The selected agency may only be endowed with powers to "administer [the] order," to "make rules and regulations to effectuate the" order, to "receive, investigate, and report to the Secretary" complaints of violations of the order, and to recommend to the Secretary amendments to the order.  *Id.* § 608c(7)(C)(i)–(iv).  With the promulgation of the Almond Order, the Secretary authorized the Almond Board of California to administer it in complete accordance with the AMAA's prescriptions and limitations.  *Compare id. with* 7 C.F.R. §§ 981.38(a)–(d).

[6] The Almond Order defines an almond "handler" as "any person handling almonds during any crop year, except" for "a grower who sells only almonds of his own production" at his or her own farm stand and for "a person receiving almonds from growers . . . and delivering these almonds to a handler."  *Id.* § 981.13.

cover Board expenses.  *Id.* §§ 981.80–981.81.  As relevant here, in 1976, following formal

rulemaking (*see* AR at 7), the Almond Order was amended and regulations regarding quality

control were added.  7 C.F.R. § 981.42.

Section 981.42 contains separate subsections governing quality control for almonds as

they are received by handlers from producers, *id.* § 981.42(a) (governing "[i]ncoming" quality

control), and for almonds before they are placed into a channel of trade.  *Id.* § 981.42(b)

(governing "[o]utgoing" quality control).[7]  The Almond Order's incoming quality control

regulation contains specific mandates.  It requires each handler to have an inspection agency

determine the percent of inedible kernels in each variety of almonds received by the handler,

report that percentage to the Board, and then deliver a Board-determined quantity of those

inedible kernels to the Board.  *Id.* § 981.42(a).[8]  By contrast, the Order's outgoing quality control

---

[7] Under the Almond Order, "To handle means to use almonds commercially of own production
or to sell, consign, transport, ship . . . or in any other way to put almonds . . . into any channel of
trade for human consumption worldwide," except that "sales or deliveries by a grower to
handlers" are not "considered as handling by a grower."  *Id.* § 981.16.  Accordingly, "incoming
quality controls address procedures to be followed after almonds are received by a handler from
a producer, whereas outgoing quality controls apply to almonds before they are placed into a
channel of trade."  (Def.'s Mot. at 11–12 n.11.)

[8] In its entirety, the incoming quality control regulation states:

> Incoming.  Except as provided in this paragraph, each handler shall cause to be
> determined, through the inspection agency, and at handler expense, the percent of
> inedible kernels in each variety received by him and shall report the determination
> to the Board.  The quantity of inedible kernels in each variety in excess of two
> percent of the kernel weight received, shall constitute a weight obligation to be
> accumulated in the course of processing and shall be delivered to the Board, or
> Board accepted crushers, feed manufacturers, or feeders.  The Board, with the
> approval of the Secretary, may change this percentage for any crop year, may
> authorize additional outlets, may exempt bleaching stock from inedible kernel
> determination or obligation and may establish rules and regulations necessary and

regulation provides the Board with significant discretion to "establish, with the approval of the

Secretary, such minimum quality and inspection requirements applicable to almonds to be

handled or to be processed into manufactured products, as will contribute to orderly marketing or

be in the public interest."  *Id.* § 981.42(b).[9]  The Board is empowered to "establish rules and

regulations necessary and incidental to the administration of" both the incoming and outgoing

quality control provisions.  *Id.* § 981.42(a),(b).

After the Board recommended that the Secretary mandate a treatment program to prevent

future *Salmonella* outbreaks, like those which had occurred in 2001 and 2004 that were linked to

raw almonds,[10] the Secretary issued the *Salmonella* Rule pursuant to the authority in the Almond

---

incidental to the administration of this provision, including the method of
determining inedible kernel content and satisfaction of the disposition obligation.
The Board for good cause may waive portions of obligations for those handlers
not generating inedible material from such sources as blanching or manufacturing.

7 C.F.R. § 981.42(a).

[9] The outgoing quality control regulation states:

Outgoing. For any crop year the Board may establish, with the approval of the
Secretary, such minimum quality and inspection requirements applicable to
almonds to be handled or to be processed into manufactured products, as will
contribute to orderly marketing or be in the public interest. In such crop year, no
handler shall handle or process almonds into manufactured items or products
unless they meet the applicable requirements as evidenced by certification
acceptable to the Board. The Board may, with the approval of the Secretary,
establish different outgoing quality requirements for different markets. The
Board, with the approval of the Secretary, may establish rules and regulations
necessary and incidental to the administration of this provision.

*Id.* § 981.42(b).

[10] For a description of the 2001 and 2004 outbreaks, and of the extensive information-gathering
process that proceeded the Board's recommendation, see 72 Fed. Reg. at 15,022–31; *Koretoff I*,
601 F. Supp. 2d at 240.  (*See also* AR at 192–94, 199–200, 215–17 (the Board's "Draft 10 Point

Order's outgoing quality control provision.  *See* 72 Fed. Reg. at 15,022 (final rule) (citing 7

C.F.R. § 981.42(b)); *id.* at 15,031 ("USDA is implementing this rulemaking action under the

quality control authority contained in the [Almond Order]."); *see also* Almonds Grown in

California; Outgoing Quality Control Requirements and Request for Approval of New

Information Collection, 71 Fed. Reg. 70,683, 70,683 (proposed Dec. 6, 2006) (citing 7 C.F.R. §

981.42(b)); *id.* at 70,690 (providing for a 45-day comment period on the proposed rule).  The

*Salmonella* Rule "provides for a mandatory program to reduce the potential for *Salmonella*

bacteria in almonds" in order to "help ensure that quality almonds are available for human

consumption."  72 Fed. Reg. at 15,022.

Plaintiffs allege that the USDA exceeded its authority under the AMAA and under the

Almond Order by promulgating the *Salmonella* Rule.  Each of these arguments will be addressed

below.

### A.    The USDA's Authority Under the AMAA

To address plaintiffs' claim that the USDA exceeded its statutory authority when it

promulgated the *Salmonella* Rule, the Court begins "with the first step of the two-part

framework announced in *Chevron* . . . and asks[s] whether Congress has 'directly addressed the

precise question at issue.'"  *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct.

704, 711 (2011) (quoting *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837,

843 (1984)).  If the statutory language is unambiguous and "the intent of Congress is clear, that

is the end of the matter; for the court, as well as the agency, must give effect to the

---

Justification," amended September 7, 2006).)  Because plaintiffs no longer challenge whether the
Board's and the Secretary's actions were supported by substantial evidence, it is not necessary to
review these materials here.

unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.  However, "if the statute is silent or ambiguous with respect to the specific issue," a court will proceed to the second step of the *Chevron* analysis and ask "whether the agency's [interpretation] is based on a permissible construction of the statute." *Id.* at 843.[11]

Plaintiffs argue that the word "quality" as used in 7 U.S.C. § 608c(6)(A) has a clear meaning that forecloses the Secretary's interpretation and does not encompass the *Salmonella* Rule's treatment mandate.  (*See* Pls.' Mot. at 6–7 (describing the AMAA as authorizing terms and conditions in marketing orders that provide "for control by 'any grade, size, or quality' of products produced during specified marketing periods" and stating that their argument centers on "[t]he meaning of 'quality'" in § 608c(6)(A)).)  At root, plaintiffs claim that the *Salmonella* Rule is a food safety measure, as distinguished from a measure to guarantee the quality of almonds such that they may be effectively marketed.  Plaintiffs contend that "quality" unambiguously "refers to an inherent, measurable attribute of a farm product" and does not encompass the absence of pathogens such as *Salmonella*.  (*Id.* at 9.)  Whereas the AMAA allows terms and conditions that take the form of "published standards" which "prevent off-grade or substandard products from depressing farm prices for quality products," plaintiffs claim that it does not authorize rules that mandate a particular type of processing to eliminate bacteria.  (*Id.*)  Plaintiffs argue that such "food safety" measures are the responsibility of the Food and Drug

---

[11] The Court notes that the *Salmonella* Rule satisfies the "crucial threshold consideration" for the application of *Chevron* deference because "the agency acted pursuant to delegated authority" in enacting it. *Am. Library Ass'n v. FCC*, 406 F.3d 689, 699 (D.C. Cir. 2005); *see United States v. Mead Corp.*, 533 U.S. 218, 226 (2001).  *See generally* 7 U.S.C. § 608c (authorizing the Secretary to issue marketing orders for certain enumerated agricultural commodities and specifying the types of terms and conditions that such orders may contain).

Administration and are clearly not encompassed by the plain meaning of "quality" in the AMAA. (*Id.* at 11.)

The Court cannot agree. "[A]ppl[ying] the traditional tools of statutory construction in order to discern whether Congress has spoken directly to the question at issue" at *Chevron*'s step one, *Eagle Broadcasting Group v. FCC*, 563 F.3d 543, 552 (D.C. Cir. 2009), the Court concludes that the AMAA does not provide an unambiguous definition for the types of "[l]imit[ations]" on "the total quantity of" a commodity or product, "or of any grade, size, or quality thereof," that a marketing order may permissibly contain. 7 U.S.C. 608c(6)(A).

"[S]tart[ing] with the plain meaning of the text" and "looking to the language itself," *Blackman v. Dist. of Columbia*, 456 F.3d 167, 176 (D.C. Cir. 2006) (internal quotation marks omitted), "quality" is not defined in the AMAA. *See* 7 U.S.C. §§ 601 *et seq.* "By using a word [such as quality] with multiple and often vague meanings, it is hard for [the Court] to conclude that Congress" has "'directly spoken to the precise question at issue.'" *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 708 (D.C. Cir. 2008) (quoting *Chevron*, 467 U.S. at 842). And while "the absence of a statutory definition does not render a word ambiguous," *Natural Resources Defense Council v. EPA*, 489 F.3d 1364, 1373 (D.C. Cir. 2007), to the extent that plaintiffs have put forward a definition for "quality,"[12] theirs is substantially narrower than the term's dictionary definition. The Oxford English Dictionary defines "quality," as it relates to a thing, as "[a]n

---

[12] Curiously, despite arguing that the plain meaning of "quality" in 7 U.S.C. § 608c(6)(A) forecloses the Secretary's interpretation of the statute in the *Salmonella* Rule, plaintiffs have not proffered a precise definition for the word, nor have they cited any sources (*i.e.*, decisions, statutes, dictionaries, or articles dealing with agricultural sciences or regulations) where one might be found. (*Cf.* Pls.' Mot. at 7 (arguing that "[t]he plain meaning of 'quality' in [§ 608c(6)(A)] can only be determined by its meaning in 1935," but nowhere describing what "quality" meant in 1935).)

attribute, property; a special feature or characteristic," or "[a] particular class, kind, or grade of something, as determined by its character, esp[ecially] its excellence."  Oxford English Dictionary Online, http://www.oed.com/view/Entry/155878 (last visited January 18, 2012); *cf. Sherley v. Sebelius*, 644 F.3d 388, 395 (D.C. Cir. 2011) (citing the Oxford English Dictionary Online's definition of a word in interpreting a statute).  Per this definition, whether almonds are contaminated by *Salmonella* might reasonably be deemed a "property" or a "characteristic" of almonds, and *Salmonella*-free almonds might constitute a "particular class" of almonds defined by "its excellence."

Plaintiffs argue, however, that "'quality,' as used in 7 U.S.C. § 608c(6)[,] . . . refers to an inherent, measurable attribute of a farm product" such that whether an almond is contaminated by *Salmonella* is irrelevant to its "quality."  (Pls.' Mot. at 9.)  As authority for this proposition, and for plaintiffs' broader argument that the AMAA does not authorize the USDA to regulate issues of food safety, plaintiffs cite a number of sources not contained in the administrative record, including a website published by the USDA's Agricultural Marketing Service ("AMS") and comments made by the Administrator of the AMS before a subcommittee of the House Committee on Agriculture in 2007.  (*See id.* at 40 ("As explained by AMS, quality standards 'are based on measurable attributes that describe the value and utility of the product.'" (quoting United States Department of Agriculture, Agricultural Marketing Service, Grading, Certification and Verification Standards, http://www.ams.usda.gov/AMSv1.0/standards (last visited January 18, 2012)); *id.* at 52 ("'AMS is not a food safety agency. . . . To conclude, Mr. Chairman, I would like to reiterate that food safety policy and the establishment of food safety standards are not within AMS' mandate.'" (ellipsis in the original) (quoting *Hearing to Review the Industry*

14

*Response to the Safety of Fresh and Fresh-Cut Produce Before the H. Subcomm. on Horticulture and Organic Agriculture of the H. Comm. on Agriculture*, 110th Cong. 4–6 (2007) (statement of Lloyd Day, Administrator, Agricultural Marketing Service, USDA), *available at* http://agriculture.house.gov/testimony/110/110-23.pdf) ("Day Statement")).)

Yet, other materials relied on by plaintiffs are contrary to their argument.  (*See id.* at 54 ("'AMS considers the absence of harmful pathogens or toxins to be a characteristic of higher quality products.'" (quoting 2009 congressional testimony by a subsequent AMS Administrator); Day Statement at 6 ("Under federal marketing orders, USDA considers food safety to be a quality characteristic of regulated fruit, vegetable, and specialty crops, and that the absence of harmful pathogens or toxins is a characteristic of higher quality products.").)  Moreover, narrowing the definition of "quality" as plaintiffs suggest, to include only an almond's "inherent, measurable attribute[s]" (Pls.' Mot. at 9), would arguably make the term redundant with "grade"[13] in violation of a well-established canon of statutory instruction.  *See Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning."), *superseded by statute on other grounds as stated in United States v. Lomax*, 293 F.3d 701, 703 (4th Cir. 2002); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("courts should disfavor interpretations of statutes that render language superfluous").  Most important, plaintiffs' proffered definition of food

---

[13] *See* United States Department of Agriculture, Agricultural Marketing Service, *United States Standards for Grades of Almonds in the Shell* (March 1997), *available at* http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5050486 (delineating U.S. No. 1, U.S. No. 1 Mixed, U.S. No. 2, and U.S. No. 2 Mixed grades of almonds according to, *inter alia*, the condition of their shells (whether they are clean, bright, and uniform in color) and whether their kernels are "well dried" and "free from decay").

"quality," as somehow distinct from food safety, differs from the dictionary definition of the word.  By arguing that 7 U.S.C. § 608c(6)(A) does not refer to the plain meaning of "quality," but rather to a more specific meaning, plaintiffs have highlighted the provision's ambiguities. *See Nat'l Mining Ass'n*, 512 F.3d at 708 ("'[T]he fact that the provision can support two plausible interpretations renders it ambiguous for purposes of *Chevron* analysis.'" (alterations in the original) (quoting *AFL-CIO v. FEC*, 333 F.3d 168, 174 (D.C. Cir. 2003)).

Nothing about "the specific context in which ['quality'] is used" or "the broader context of the statute as a whole" compels a contrary conclusion.  *Blackman*, 456 F.3d at 176 (internal quotation marks omitted).  Nor does an examination of the AMAA's purpose and legislative history reveal a definition for "quality."  *See Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 663 (D.C. Cir. 2009) ("using all 'traditional tools of statutory interpretation,' including 'text, structure, purpose, and legislative history,' to ascertain Congress' intent at *Chevron* step one" (quoting *Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001))).  In enacting the AMAA, Congress made clear that it sought to permit the USDA "to establish and maintain . . . such *minimum standards of quality* and maturity and such grading and inspection requirements for agricultural commodities enumerated in [7 U.S.C. § 608c(2)] . . . as will effectuate [the] orderly marketing of such agricultural commodities as will be in the public interest."  7 U.S.C. § 602(3) (emphasis added).  The legislative history of the law reveals Congress' intent to "'specify the terms which may be included in orders dealing with the enumerated commodities.'"  *Zuber v. Allen*, 396 U.S. 168, 183 n.16 (1969) (quoting H.R. Rep.

No. 1241, 74th Cong., 1st Sess., at 10 (1935)).[14]  Congress specified that marketing orders could contain terms and conditions that "[l]imit[], or provid[e] methods for the limitation of, the total quantity of any" identified agricultural "commodity or product, or of any grade, size, or quality thereof."  7 U.S.C. § 608c(6)(A).  The statute does not evince a particular meaning for "quality."

Thus, "[h]aving rejected [plaintiffs'] arguments that [§ 608c(6)(A)] unambiguously forecloses the [Secretary's] interpretation, [the Court is] left to decide whether that interpretation is reasonable under *Chevron* step two's 'highly deferential standard.'"  *Cablevision Systems Corp. v. FCC*, 649 F.3d 695, 709 (D.C. Cir. 2011) (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Reno*, 216 F.3d 122, 137 (D.C. Cir. 2000)).  The Court concludes that it is, and that the *Salmonella* Rule does not exceed the Secretary's authority under the AMAA.

The AMAA authorizes the Secretary to intervene in the markets for various agricultural commodities and products in order to ensure their stable and effective functioning.  7 U.S.C. §§ 602(3), 608c(6).  The statute specifically contemplates interventions relating to "quality," *id.* § 608c(6)(A), but does not define that term.  In drafting the statute as such, it is apparent that Congress gave the agency the flexibility it needs to respond to both general market conditions and external threats, such as the *Salmonella* outbreaks in 2001 and 2004, which have the

---

[14] *See also Brannan v. Stark*, 342 U.S. 451, 466 n.16 (1952) ("The statutory provisions setting forth the terms which might be included in marketing orders were first enacted in an amendment to the Agricultural Adjustment Act in 1935 . . . shortly after" the Supreme Court issued decisions in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), which "plac[ed] limitations on the delegation of rule-making authority to administrative agencies.  With these cases specifically in mind, Congress set forth with deliberate particularity and completeness the terms which the Secretary might include in marketing orders." (citing H.R. Rep. No. 1241, 74th Cong., 1st Sess., at 8 (1935); S. Rep. No. 1011, 74th Cong., 1st Sess., at 8 (1935)).

potential to cause significant market disruption.[15]   The Secretary's interpretation of 7 U.S.C. §

608c(6)(A) as authorizing the *Salmonella* Rule is there reasonable and is entitled to this Court's

deference.   *See Sec'y of Labor, Mine Safety & Health Admin. v. Excel Mining, LLC*, 334 F.3d 1,

11 (D.C. Cir. 2003) ("When 'a challenge to an agency construction of a statutory provision,

fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it

is a reasonable choice within a gap left open by Congress, the challenge must fail.'" (quoting

*Chevron*, 467 U.S. at 866)).

      Relying on *Zuber*, plaintiffs counter that the AMAA "does not contain a mandate phrased

in broad and permissive terms," 396 U.S. at 183, and they point to decisions construing its

provisions as constraining the Secretary's authority.   *See id.* at 180–91; *Smyser v. Block*, 760

F.2d 514, 522 (3d Cir. 1985) (concluding that a particular term in a milk marketing order fell

outside of the "one or more" and "no others" list in 7 U.S.C. § 608c(5) and stating that if the

mechanisms in that list were insufficient "to meet exigent market situations, then the industry

must once more resort to Congress" (internal quotation marks and citation omitted)); *Blair v.

Freeman*, 370 F.2d 229, 235–36 (D.C. Cir. 1966) (same).   Yet these decisions do not foreclose

the USDA's interpretation of 7 U.S.C. § 608c(6) as permitting the *Salmonella* Rule.

      *Zuber*, *Smyser*, and *Blair* all concerned challenges to regulations promulgated pursuant to

the Secretary's authority under the AMAA to "provide[] for a uniform market price" for milk

"payable to all producers by all handlers."   *Zuber*, 396 U.S. at 177; *see Stark v. Wickard*, 321

U.S. 288, 294 (1944) ("The immediate object of the Act is to fix minimum prices for the sale of

milk by producers to handlers."); 7 U.S.C. § 608c(5) (enumerating the permissible terms and

_____

[15] The 2004 outbreak led to a recall of approximately 15 million pounds of almonds.   *See* 72 Fed.
Reg. at 15,022.

conditions that marketing orders for milk and milk products may contain, and specifying only

certain permissible departures from the uniform price requirement).  Section 608c(5) authorizes

"[t]he Secretary of Agriculture [to] establish[] formulas to calculate the minimum prices that

dairy handlers (processors, manufacturers, and distributors) must pay dairy producers (farmers)

for milk."  *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 817 (D.C. Cir.

2009); *see id.* at 817–19 (providing a useful map of what the Supreme Court has described as

"the labyrinth of the federal milk marketing regulation provisions," *Zuber*, 396 U.S. at 172).

The relative complexity of the § 608c(5) provisions regarding milk as compared with the

§ 608c(6) provisions applicable to all other regulated commodities, including almonds, derives

from "two distinctive and essential phenomena of the milk industry"—first, "a basic two-price

structure that permits a higher return" for milk sold for direct human consumption, as opposed to

that sold for processing into "manufactured dairy products such as butter and cheese," and

second, "the cyclical characteristic of [milk] production," with low yields in the colder months

and high yields in the warmer months.  *Zuber*, 396 U.S. at 172; *see Blair*, 370 F.2d at 232

("Difficult and peculiar problems afflicting the milk industry have long prompted attempts to

smooth out the erratic fortunes of milk marketing through the regulation of prices and

production.").[16]  Thus, the "essential purpose" behind the AMAA's milk-related provisions is "to

---

[16] *See also Ark. Dairy Co-op Ass'n*, 573 F.3d at 818 (stating that the same "two factors"
described above continue to "create variations in the supply and demand of milk" today);
*Smyser*, 760 F.2d at 516 ("It was this scenario that Judge Jerome Frank had in mind when he
wrote that milk often provoked 'as much human strife and nastiness as strong alcoholic
beverages.'" (quoting *Queensboro Farms Prods. v. Wickard*, 137 F.2d 969, 974 (2d Cir. 1943));
*id.* at 521 (stating that the AMAA's detailed provisions enumerating permissible interventions in
the milk market "were intended 'to eliminate, so far as possible, violent seasonal fluctuations in
the available milk supply with their attendant disturbing effect upon returns to producers . . . .'"

raise producer prices, and thereby to ensure that the benefits and burdens of the milk market are fairly and proportionately shared by all dairy farmers." *Ark. Dairy Co-op Ass'n*, 573 F.3d at 818 (internal quotation marks omitted); *see Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 341–42 (1984) (citing S. Rep. No. 1011, 74th Cong., 1st Sess., at 3 (1935)).

By contrast, while Congress did not write the Secretary a blank check with regard to markets for non-dairy commodities, its relatively less specific purpose is reflected in the broader leeway that the statute provides the USDA to fashion marketing orders for such commodities. Market stability remains the touchstone of the AMAA's provisions regarding these commodities, *see* 7 U.S.C. § 602, but Congress' concern for these markets extended beyond market price. The provision at issue here permits marketing orders to contain terms and conditions that "[l]imit[], or provid[e] methods for the limitation of, the total quantity of" such commodities, "or of any grade, size, or quality thereof." 7 U.S.C. § 608c(6)(A). The AMAA provision at issue in *Zuber*, on the other hand, is focused specifically on maintaining a uniform price in the market for milk. That provision authorizes terms in milk marketing orders that

> [c]lassify[] milk in accordance with the form in which or the purpose for which it is used, *and fix*[]*, or provid*[e] *a method for fixing, minimum prices for each such use classification* which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such *prices shall be uniform as to all handlers*, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers. Throughout the 2-year period beginning on the effective date of this sentence (and subsequent to such 2-year period unless modified by amendment to the order involved), the minimum aggregate amount of the adjustments, under clauses (1) and (2) of the preceding sentence, to prices for

(ellipsis in the original) (quoting S. Rep. No. 1011, 74th Cong., 1st Sess., at 11 (1935); H.R. Rep. No. 1241, 74th Cong., 1st Sess., at 10 (1935))).

> milk of the highest use classification under orders that are in effect under this
> section on December 23, 1985, shall be as follows . . . .

7 U.S.C. § 608c(5)(A) (emphasis added) (continuing to specify "minimum aggregate dollar

amounts of such adjustments per hundredweight of milk having 3.5 percent milkfat"

(capitalization altered)); *see also id.* §§ 608c(5)(B)–(F),(J),(L)–(O) (authorizing terms and

conditions also pertaining to prices, with specific focus on permitting the Secretary to mandate

payments between producers and handlers and specifying permissible adjustments the Secretary

can make to those payments).

In *Zuber*, the question before the Court was whether a provision in a milk marketing

order which "require[d] milk distributors to pay to milk producers situated at certain distances

from milk marketing areas," or so-called "'nearby' farmers, higher prices than are paid to

producers located at greater distances from such areas," 396 U.S. at 171, was permissible where

the statute specified that prices "shall be uniform as to all handlers, subject only to adjustments

for (1) volume, market, and production differentials customarily applied by the handlers subject

to such order . . . ." 7 U.S.C. § 608c(5)(A).  On the basis of a lengthy analysis of the history of

federal milk regulation programs, the Supreme Court concluded that the Secretary had exceeded

its statutory authority because the Secretary's "'nearby' differential" did not qualify as the kind

of "cost adjustment" contemplated by the statute, which authorized only very specific departures

from the uniform prices that it mandated.  *Zuber*, 396 U.S. at 180.[17]  The Court also found that

the Secretary's "proposed reading of" the provision would perpetuate the very "ruinous and self-

---

[17] *See also Smyser*, 760 F.2d at 519–20 (concluding that where even the Secretary admitted that
the challenged term of a milk marketing order constituted "an additional mechanism" that served
the purposes of the AMAA but that was not specifically authorized by its provisions, the term
was *ultra vires*).

defeating competition among the producers" that the AMAA's drafters sought to prevent.  *Id.* at 180–81.[18]

Especially given that *Zuber* interprets the markedly different provisions of § 608c(5) regarding milk marketing orders, the fact that the AMAA as a whole "does not contain a mandate phrased in broad and permissive terms," 396 U.S. at 183, does not suffice, without more, to sustain plaintiffs' challenge.  Plaintiffs cannot rely on *Zuber* and related cases without showing that the *Salmonella* Rule is categorically different from the kinds of terms and conditions that the statutory text authorizes, and that the Rule undermines (or at the very least is unrelated to) Congress' purposes in enacting the AMAA.  But, as discussed above, plaintiffs cannot make these showings here.  On the contrary, the Secretary reasonably determined that the *Salmonella* Rule regulates the "quality" of almonds pursuant to 7 U.S.C. § 608c(6)(A).  Whereas condoning the agency actions at issue in *Zuber*, *Smyser*, and *Blair* would have amounted to "enlargement" of the statute rather than "construction of it" given the "particularization and detail" with which Congress has described the categories of permissible provisions in milk marketing orders, *Iselin v. United States*, 270 U.S. 245, 250 (1926), that is not the case with the *Salmonella* Rule.  And whereas *Zuber*, *Smyser*, and *Blair* expressed concern that the agency actions undermined Congress' purposes in enacting the AMAA, the *Salmonella* Rule constitutes a "minimum standard[] of quality" for almonds trafficking in interstate commerce so as to "effectuate [their] orderly marketing . . . as will be in the public interest."  7 U.S.C. § 602(3).

---

[18] *See also Zuber*, 396 U.S. at 193 (The USDA presented no evidence to "explain[] how the [regulation at issue] contribute[d] to the broad, general purpose" underlying the milk-related provisions of the AMAA "of eliminating crippling competition."); *Blair*, 370 F.2d at 237 (concluding that "the nearby differential adjustment" impermissibly "turn[ed] on [] consideration of" a factor which Congress explicitly placed off limits when it enacted the AMAA).

Plaintiffs' appeal to *Supreme Beef Processors v. U.S. Dep't of Agric.*, 275 F.3d 432 (5th Cir. 2001), is also unavailing.[19] *Supreme Beef Processors* addresses a statutory regime that is dramatically different from that at issue here.  The Fifth Circuit's conclusion that the challenged regulation exceeded the Secretary's powers was based on the fact that the Federal Meat Inspection Act "does not authorize regulation of the levels of bacterial infection in incoming raw materials."  *Supreme Beef Processors*, 275 F.3d at 442.  The Court's reasoning is not dependent on a rigid distinction between food quality and food safety measures, as plaintiffs argue.  (*See* Pls.' Mot. at 5, 11.)  Furthermore, to the extent the Fifth Circuit's decision is relevant, it weakens plaintiffs' case.  First, the fact that the court referred to the presence of *Salmonella* in raw meat as a "characteristic" of that meat, *id.* at 441, lends credence to the Secretary's argument that the presence of *Salmonella* in almonds is relevant to their "quality."  And second, if the regulations addressed by the Fifth Circuit pertained to "quality control," as plaintiffs maintain (Pls.' Mot. at 11), then the *Salmonella* Rule does as well.  The former allowed the Secretary to condemn a beef grinder if meat that it processed contained levels of *Salmonella* that exceeded a certain threshold, 275 F.3d 435, 442, and the latter "provides for a mandatory program to reduce the potential for

---

[19] In *Supreme Beef Processors*, the Fifth Circuit determined that certain *Salmonella*-related meat inspection regulations exceeded the Secretary's authority under the Federal Meat Inspection Act, 21 U.S.C. §§ 601 *et seq*. 275 F.3d at 434.  The question before the Court at step one of the *Chevron* analysis was whether raw meat was "rendered adulterated" by a processer when it may have been contaminated with *Salmonella* at the time the processor received it.  21 U.S.C. § 608; *see Supreme Beef Processers*, 275 F.3d at 440 ("In order for a product to be adulterated under [the Federal Meat Inspection Act], as the USDA relies on it here, it must be 'prepared, packed or held under insanitary conditions . . . whereby it may have been *rendered* injurious to health.'" (second alteration and emphasis in the original) (quoting 21 U.S.C. § 601(m)(4))).  The Court concluded that "[t]he use of the word 'rendered' in the statute indicates that a deleterious change in the product must occur while it is being 'prepared, packed or held' owing to insanitary conditions," and that "a characteristic of the raw materials that exists before the product is 'prepared, packed or held' in the grinder's establishment cannot be regulated by the USDA under [the statute]."  *Id.* (footnote omitted).

*Salmonella* bacteria in almonds." 72 Fed. Reg. at 15,022. In other words, the "quality" of *Salmonella*-free products is interpreted in a similar fashion in both instances.

For these reasons, the Court concludes that plaintiffs' arguments regarding the meaning of "quality" in 7 U.S.C. § 608c(6)(A) fail. The agency's interpretation of the AMAA in the *Salmonella* Rule is reasonable and is therefore entitled to *Chevron* deference.

### B.   The USDA's Authority Under the Almond Order

Since the Court has found that the *Salmonella* Rule is within the Secretary's authority under the AMAA, it follows that the Rule is also authorized under the Almond Order. In promulgating the *Salmonella* Rule, the Secretary specified that the Rule was authorized pursuant to the Almond Order's outgoing quality control provision. *See* 72 Fed. Reg. at 15,022 (citing 7 C.F.R. § 981.42(b)). That provision permits the Almond Board of California to "establish, with the approval of the Secretary, such minimum quality and inspection requirements applicable to almonds to be handled or to be processed into manufactured products, as will contribute to orderly marketing or be in the public interest." 7 C.F.R. § 981.42(b). The outgoing quality control provision further specifies that handlers must comply with the "applicable requirements" authorized under the provision and empowers the Board, again with the Secretary's approval, to "establish rules and regulations necessary and incidental to the administration of [the] provision." *Id.*

Plaintiffs argue that the *Salmonella* Rule is not a "minimum quality . . . requirement[]," *id.*, because the Order's outgoing quality control provision only contemplates regulations that "exclu[de] . . . inedible nuts from the market," and that almonds contaminated with *Salmonella*

are not "inedible" per the definition of that term in the Order.[20]  (Pls.' Mot. at 14.)  In support of

their argument, plaintiffs claim that the outgoing quality control provision was intended only as a

backup in case the incoming quality control provision set forth in 7 C.F.R. § 981.42(a) proved

insufficient,[21] and accordingly that the terms of the former must be interpreted in light of the

latter.  Because the sole purpose of the incoming quality control provision "was to define those

almonds that were 'inedible' and prevent them from reaching the consumer market," or so

plaintiffs argue (Pls.' Mot. at 15), the outgoing quality provision does not authorize the type of

treatment that the *Salmonella* Rule mandates.

Courts "give 'substantial deference' to an agency's interpretation of its own regulations,

'only setting it aside if the plain language of the regulation or other indications of the [agency's]

intent require another interpretation.'"  *Orion Reserves Ltd.*, 553 F.3d at 707 (alteration in the

original; some internal quotation marks omitted) (quoting *Fabri Constr. Co. v. Sec'y of Labor*,

508 F.3d 1077, 1080–81 (D.C. Circ. 2007)); *see Auer v. Robbins*, 519 U.S. 452, 461 (1997);

*Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1036 (D.C. Cir. 2008) ("An agency's

---

[20] The Almond Order defines an "inedible kernel" as "a kernel, piece, or particle of almond kernel with any defect scored as serious damage, or damage due to mold, gum, shrivel, or brown spot, as defined in the United States Standards for Shelled Almonds, or which has embedded dirt not easily removed by washing."  7 C.F.R. § 981.8.

[21] As authority for this proposition, plaintiffs cite materials in the Federal Register pertaining to the 1976 amendments to the Almond Order, including the incoming and outgoing quality control provisions.  (*See* Pls.' Mot. at 14–15 (citing Almonds Grown in California; Decision on Proposed Further Amendment of the Marketing Agreement and Order, 41 Fed. Reg. 22,075, 22,078 (June 1, 1976) ("The evidence is that [the outgoing quality control provision] is intended as a contingency for use only if the incoming regulation should prove inadequate for industry needs.").)  Defendant protests that these materials are not in the administrative record, but because they are published in the Federal Register this Court can take judicial notice of them.  44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . .").

determination of its own regulation is entitled to 'substantial deference,' unless 'plainly

erroneous or inconsistent with the regulation.'" (quoting *Thomas Jefferson Univ. v. Shalala*, 512

U.S. 504, 512 (1994)).  Here, nothing in the plain language of the outgoing quality control

provision, 7 C.F.R. § 981.42(b), undermines the validity of the *Salmonella* Rule.  Quite the

contrary, for all the reasons cited in support of the conclusion that the Rule fell within the

Secretary's authority under the AMAA (*see supra* pp. 12–18), the Court also finds that the Rule

is contemplated by the outgoing quality control provision.  As in the AMAA, the word "quality"

is not defined in the Almond Order.  *See* 7 C.F.R. pt. 1.  Because the *Salmonella* Rule ensures

that only *Salmonella*-free almonds are sold, it is not unreasonable for the Secretary to have

deemed it a "minimum quality . . . requirement[]" that "contribute[s] to orderly marketing" and

serves "the public interest."  *Id.* § 981.42(b); *see* 72 Fed. Reg. at 15,021 (finding that "a

mandatory program . . . to reduce the potential for *Salmonella* bacteria in almonds . . . will help

ensure that quality almonds are available for human consumption").

        Nor do "other indications of the [agency's] intent require another interpretation."  *Orion

Reserves Ltd.*, 553 F.3d at 707 (alteration in the original; internal quotation marks omitted).

Plaintiffs' argument that the bounds of what is permissible under the outgoing quality control

provision must be determined with reference to the incoming quality control provision

undermines their broader point.  Whereas the incoming quality control provision contemplates

specific interventions, the outgoing provision is phrased in expansive terms.  *Compare* 7 C.F.R.

§ 981.42(a) (mandating that handlers implement and fund particular inspection requirements

with regard to "inedible kernels") *with id.* § 981.42(b) (authorizing "such minimum quality and

inspection requirements applicable to almonds to be handled or to be processed into

manufactured products, as will contribute to orderly marketing or be in the public interest," and making no mention of inedible kernels).  Reading these passages together for indicia of the Secretary's intent in the latter, as plaintiffs suggest, yields the conclusion that the Secretary provided the Board with specific instructions regarding permissible incoming quality control provisions and allowed it to exercise more discretion, if necessary, with regard to outgoing quality control provisions.[22]  At the very least, this conclusion is "reasonable," and the Court must defer to the agency's reliance on it.  *Devon Energy Corp.*, 551 F.3d at 1037.[23]

_____

[22] Further confirmation that the Secretary intended the outgoing quality control provisions to answer broadly to "industry needs," as stated in 41 Fed. Reg. at 22,078, and not be limited to addressing issues of "inedible kernels," as narrowly defined in the Order, *see* 7 C.F.R. § 981.8, is also provided by plaintiffs' own argument.  Plaintiffs argue that the "inedible kernel" definition "address[es] measureable defects in the physical condition of the nut itself, which can generally be ascertained by inspection as the almond is received by the handler."  (Pls.' Mot. at 15–16.)  And yet if that is the case, and the outgoing quality control provision was indeed limited to addressing defects that can be ascertained by inspection, then defendant is correct that "there would be no reason for the language of [§] 981.42(b) to refer to 'minimum quality *and* inspection requirements.'"  (Def.'s Mot. at 33 (emphasis in the original).)

[23] Plaintiffs' comparisons of the *Salmonella* Rule to terms and conditions applicable to other commodities, raised only in their statement of facts (*see* Pls.' Mot. at 55–56), also weaken their argument.  Plaintiffs protest that quality control measures for prunes, raisins, and peanuts only deem these products "substandard or off-grade" once they have "been subject to inspection," after which point "the product[s] may [] be restored to marketable quality by remedial treatment," whereas the *Salmonella* Rule applies whether or not the almonds in question have been contaminated by the bacteria.  But a comparison of the outgoing quality control provisions in the relevant marketing orders or agreements reveals that the Secretary has *more* discretion with regard to almonds than it does with regard to these other products.  *Compare* 7 CFR § 981.42(b) (authorizing such "*minimum quality and inspection requirements* applicable to almonds to be handled or to be processed into manufactured products, as will contribute to orderly marketing or be in the public interest" (emphasis added)) *with id.* § 993.50(b) ("The Secretary . . . may establish *size regulations, pack specifications, or more restrictive grade regulations* with respect to prunes that may be shipped or otherwise disposed of by a handler if such action would tend to effectuate the declared policy of the act." (emphasis added)) *and id.* § 989.159(c) (providing that "[o]utgoing inspection and certification of raisins . . . *shall be made of each individual lot*" (emphasis added)) *and id.* § 996.31(a) ("No handler or importer shall ship or otherwise dispose of shelled peanuts for human consumption unless such peanuts are positive lot

Plaintiffs also protest that the outgoing quality control provision contemplates quality requirements "[f]or any crop year," 7 C.F.R. § 981.42(b), whereas the *Salmonella* Rule applies "beginning September 1, 2007" and does not specify an end date. *Id.* § 981.442(b); *see* 72 Fed. Reg. at 15,034. There is, however, no conflict here. Especially given the "substantial deference" owed to an agency's interpretation of its own regulation, *Devon Energy Corp.*, 551 F.3d at 1036 (internal quotation marks omitted), the Secretary may reasonably determine that an outgoing quality control requirement authorized for "any" year is, over time, authorized every year. *Cf.* 7 U.S.C. § 608c(6)(A) (authorizing quality-related terms and conditions in marketing orders that apply "during any specified period *or periods*" (emphasis added)). As defendant argues, "The effective dates for marketing order provisions depend on the nature of the product and whether the conditions leading to the need for the regulation are conditions that are more likely to vary from one particular crop year to the next, or within a particular crop year." (Def.'s Reply at 9 n.8.) The Secretary is entitled to decide that where a marketing order provision responds to conditions that are not limited to a particular harvest, it need not re-promulgate the provision annually.

For these reasons, the Court concludes that the *Salmonella* Rule does not exceed the Secretary's authority under the Almond Order's outgoing quality control provision.

## III.    USDA'S USE OF INFORMAL RULEMAKING TO PROMULGATE THE *SALMONELLA* RULE

Finally, plaintiffs claim that the Secretary did not comply with its procedural obligations under the AMAA and its accompanying regulations in promulgating the *Salmonella* Rule. Yet,

---

identified, chemically analyzed by a USDA laboratory or USDA-approved laboratory and certified 'negative' as to aflatoxin, and certified by the Inspection Service as meeting the following quality standards: . . . .").

all of the procedural protections plaintiffs seek—a hearing[24] and almond producers' right to

vote[25] on the Rule—apply only if the *Salmonella* Rule is an amendment to the Almond Order,

and not a requirement promulgated pursuant to the authority in the Order's outgoing quality

control provision, 7 C.F.R. § 981.42(b).  (*See* Pls.' Mot. at 17 ("[C]hanges to the terms of a

marketing order are accomplished by an amendment to the order.  This process requires holding

a formal rulemaking hearing and producer referendum to approve or reject the amendments.").)

The Circuit's ruling in *Koretoff II*, however, clearly rejected the argument that the Rule amended

the Order:

> [P]roducers did not vote on promulgation of 7 C.F.R. § 981.442(b)'s [*Salmonella*
> R]ule.  Rather, that regulation was promulgated pursuant to the authority of
> the . . . Board—with the approval of the Secretary—to establish "such minimum
> quality and inspection requirements . . . as will contribute to orderly marketing or
> be in the public interest" and to "establish rules and regulations necessary and
> incidental."  7 C.F.R. § 981.42(b); *see* . . . 71 Fed. Reg. [at] 70,687 . . . .  Because
> *such rules are not amendments to the Order*, no producer referendum was held
> before promulgation of the [*Salmonella* R]ule.

614 F.3d at 539 n.3 (emphasis added; some alterations in the original).  Since this

precedent establishes that the Secretary did not need to hold a hearing and a producer

referendum, there is no need for the Court to even reach defendant's alternative argument

that any procedural errors were harmless.

---

[24] The AMAA specifies that the issuance of new marketing orders must be preceded by a
hearing, 7 U.S.C. § 608c(3), and applies the same requirement to amendments to marketing
orders, *id.* § 608c(17)(A), notwithstanding that it also authorizes the Secretary to use informal
rulemaking to amend non-milk marketing orders.  *Id.* § 608c(17)(E) ("Use of informal
rulemaking").

[25] *See* 7 U.S.C. § 608c(9)(B); *Block v. Cmty. Nutrition Inst.*, 467 U.S. at 341 (describing when
and how the requirements in § 608c(9) apply).

## CONCLUSION

For the foregoing reasons, the Court concludes that the *Salmonella* Rule was within the Secretary's authority under the AMAA and the Almond Order, and it was promulgated pursuant to the proper procedures.  Defendant's Motion for Summary Judgment is granted.  A separate order accompanies this memorandum opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   January 18, 2012